OPINION OF THE COURT
Richard D. Rosenbloom, J.
This proceeding is brought by the Director of the Monroe County Department of Social Services pursuant to section 384-b of the Social Services Law for an order appointing him guardian of Erin Roth, an infant. Petitioner alleges that the infant’s mother, Mary Roth, is presently and for the foreseeable future unable to provide proper and adequate care by reason of mental illness as defined in section 384-b (subd 6, par [a]).
Erin is 14 years old and has been in foster care since 1973. Her mother visits with her regularly every three weeks for approximately two hours as permitted by petitioner. According to caseworker Rose Doble, Erin is generally happy during the visits and wants to continue seeing her mother.
Dr. Christopher Hodgman, a psychiatrist, testified that he examined respondent and diagnosed her condition as an *700 impulse ridden character disorder. He explained that this was a mental condition in which respondent’s impulses outweigh her reasonable judgment. He stated that respondent had a disturbance in behavior to the extent of affecting the welfare of her child and that it was likely to continue in the future. His opinion was that the child should not be in the custody of respondent because of a danger of neglect and he commented that it would not be in Erin’s best interests to discontinue visits with respondent. Records of Genesee Hospital were also reviewed and disclosed suicide gestures by respondent in 1973 and 1975.
Dr. Nellie Mitchell, a child psychiatrist, described Dr. Hodgman’s diagnosis as sudden, unpredictable behavior which would present a risk to the emotional health of the child if returned. She stated that Erin loves her mother and has received some emotional benefit from her. She testified that Erin wants to continue her visits and that they do not cause stress for her. She recommended that respondent’s parental rights be terminated and that visits be continued, if that course of action were possible.
Mrs. Roth stated that she enjoys her regular visits with Erin, does not want her to be adopted but is willing to allow her to stay in foster care. She recognized her own need for help and expressed her intention to continue her course of treatment with the Genesee Mental Health Center.
Pamela Walter, a psychiatric social worker at Genesee Mental Health Center, testified about her contacts with respondent since 1975. She stated that she sees respondent every two weeks and helps her cope with problems with supportive psychotherapy. In the past, respondent was also involved in group therapy. In her opinion, respondent is neither psychotic nor neurotic. Ms. Walter stated that respondent has shown great improvement but that she was not capable of caring for Erin at the time of trial. She commented that it would be cruel to respondent to permanently terminate her parental rights.
Dr. Jonathan Ecker, a psychiatrist, also testified on behalf of respondent. He noted that “impulse ridden character disorder” did not appear in DSM, 1st, 2d or 3d editions, the standard classification of mental disorders *701 used by the American Psychiatric Association. He stated that the degree to which two psychiatrists could come to an agreement on a specific, nonorganic condition, was 40% or less. He expressed his opinion that Dr. Hodgman’s various diagnoses were inconsistent. Dr. Ecker stated that psychiatrists cannot make valid predictions of future behavior and generally questioned the ability of psychiatrists to give expert testimony.
Respondent contends that petitioner’s proof was not clear and convincing in that the psychiatric diagnosis had little probative value, particularly as to respondent’s future conduct. In addition, respondent renewed a motion to dismiss on grounds that the statute under consideration violates her rights to equal protection under the law and that it denies her due process of law by being vague, indefinite and overbroad. Finally, respondent argues that this proceeding violates her rights under the Rehabilitation Act of 1973 (US Code, tit 29, § 794).
Section 504 of the Rehabilitation Act of 1973 provides: “No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.” (87 US Stat 394 as amd, US Code, tit 29, § 794.)
A handicapped individual is defined in the statute and the applicable regulations (45 CFR 84.3 [j]) as “any person who (i) has a physical or mental impairment which substantially limits one or more major life activities”. Major life activities are defined as “functions such as caring for one’s self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.” (45 CFR 84.3 [j] [2] [ii].) Respondent is a handicapped individual as defined above in that she receives Social Security disability benefits and has been unable to work since 1974. Furthermore, it is alleged that respondent is unable to care for her child which this court considers to be a “major life activity.”
*702 The regulations confirm that the act is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance (45 CFR 84.1, 84.4). 45 CFR 84.3 (f) defines recipient as “any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.” 45 CFR 84.52 (a) further provides that “In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap: (1) Deny a qualified handicapped person these benefits or services”. In this regard, it is noted that the Monroe County Department of Social Services is a recipient of Federal financial assistance in that it participates in a multitude of Federal programs such as AFDC, Medicaid, food stamps, title XX and CETA.
An analysis of section 384-b of the Social Services Law discloses that it treats mentally ill and mentally retarded parents differently than it treats those parents without such conditions in the following respects:
1. Parents without mental handicaps may only have their parental rights terminated upon proof of abandonment (Social Services Law, § 384-b, subd 4, par [b]) or permanent neglect (Social Services Law, § 384-b, subd 4, par [d]). Parents who are mentally handicapped may have their parental rights terminated merely by reason of that status and a prediction of its continuance for the foreseeable future (Social Services Law, § 384-b, subd 4, par [c]).
2. Parents without mental handicaps who are charged with permanent neglect are afforded a dispositional hearing to determine the child’s best interests (Family Ct Act, §§ 623, 631). Parents who are mentally handicapped have no such right. The statute apparently presumes that termination of parental rights is invariably in the best interests of children of mentally handicapped parents.
3. Subdivision 1 of section 384-b of the Social Services Law includes the following statement among its legislative findings: “the state’s first obligation is to help the family *703 with services to prevent its break-up or to reunite it if the child has already left home”. The Department of Social Services is required to make diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child before a finding of permanent neglect can be made against a parent who has no mental handicap (Social Services Law, § 384-b, subd 7, par [a]). This requirement is further defined as including the “provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated”. (Social Services Law, § 384-b, subd 7, par [f], cl [3].) There is no such requirement of diligent efforts as to parents who are mentally ill or mentally retarded.
4. Parents without mental handicaps cannot have their parental rights terminated for permanent neglect if they are physically unable to maintain contact with or plan for the future of their child (Social Services Law, § 384-b, subd 7, par [a]). The Court of Appeals recently held that this exception for physical inability did not exonerate parents whose inability is based on mental illness (Matter of Hime Y., 52 NY2d 242). Therefore, parents who are unable to maintain contact with or plan for the future of their child by reason of a mental infirmity may have their rights terminated in spite of that infirmity.
The foregoing examples are illustrative of the disparate treatment afforded parents who are mentally ill or retarded. In each case, the mentally handicapped parent receives less services and enjoys less rights. The conclusion is inescapable that section 384-b of the Social Services Law denies benefits to and discriminates against the handicapped in violation of the Rehabilitation Act of 1973. Since the State statute frustrates the purposes of a Federal statute, it violates the supremacy clause of article VI of the United States Constitution and cannot stand. (See, also, 45 CFR 84.10.) In view of this determination, it is unnecessary to consider the constitutional issues presented.
For the reasons stated herein, the petition is dismissed. The petitioner is directed to commence a proceeding to *704 review the foster care status of the child, pursuant to the provisions of section 392 of thé Social Services Law.